Nella Beth Alexander v. Commissioner. Robert Alexander v. Commissioner.
Alexander v. Commissioner
Docket Nos. 16478, 16479, 18869, 18870.
United States Tax Court
1950 Tax Ct. Memo LEXIS 271; 9 T.C.M. (CCH) 115; T.C.M. (RIA) 50040; February 21, 1950
Arthur Glover, Esq., and Walter G. Russell, C.P.A., Amarillo Bldg., Amarillo, Tex., for the petitioners. Donald P. Chehock, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These cases, duly consolidated, involve income tax for the calendar years 1943 and 1944. Deficiencies were determined as follows: Docket
Taxable
No.
Petitioner
Year
Amount
16478
Nella Beth Alexander
1943
$1,258.20
16479
Robert Alexander
1943
1,237.46
18869
Robert Alexander
1944
1,049.46
18870
Nella Beth Alexander
1944
1,049.46
*272 Certain issues have been eliminated by stipulation which will be reflected in decision to be entered under Rule 50. The only issue remaining for consideration is whether the petitioners are taxable upon certain income contended by them to be that of their adopted son. An ancillary question is whether the respondent erred in allowing the petitioners credit for dependency for the boy, after finding that the income involved was that of the petitioners. From evidence both oral and documentary, we make the following Findings of Fact The petitioners are husband and wife, resident at Gruver, Texas. The returns for the taxable years were filed with the collector for the second district of Texas at Dallas. Robert Alexander will be hereinafter referred to as the petitioner. They had an adopted son, Robert Alexander, Jr., who was born in February 1929 and was in the two taxable years 14 and 15 years old, respectively. The petitioner was a stock farmer, as his father had been. He had received a part of his ranch and holdings from his father. The petitioner's ranch in the taxable years consisted of about ten or eleven sections of grass land and three or four sections of farm land. There *273 was altogether on the average during the taxable years a herd of cattle of from 350 to 800 head on the ranches. Petitioner's cattle brand was "A". The petitioner's principal source of income was from buying, feeding, pasturing, and selling cattle and raising wheat, on his ranches. Robert Alexander, Jr. began to learn to ride when about four years of age and was raised on the ranch. He did the usual things a boy does on a ranch. He attended, during the winters, a school near the ranch, and did chores, and did whatever was necessary to be done during vacations and on week-ends. He was paid nothing for his services. From the autumn of 1942 until 1948 the boy attended school at Canyon City, Colorado, about 300 miles from home. He was at home during the summertime and during vacations. His school terms in the school in Colorado started about the first of September and ended the latter part of May of each year, with the principal vacations at Christmas and Easter, the Christmas vacation being from about December 15 to January 5 and the Easter vacation being about one week. Robert, Jr. did whatever was to be done around the ranch; moved cattle and helped the men fix windmills. He did *274 not drive a tractor much, only in an emergency, and did more tending to cattle than he did farm work, with which he helped only at "odd times when we would be short." The petitioner paid Robert, Jr.'s living expenses and school expenses throughout his school years. On May 8, 1937, a bank account of $17.24 was opened for the boy, from gifts from his grandfather and different people. In March 1940, $64.05 was added, being the proceeds of a calf belonging to him, which the petitioner sold. Petitioner had given the calf to the boy with a cow branded "A-Bar," which later died and was replaced by petitioner. On September 17, 1942, petitioner deposited $451.90 in Robert, Jr.'s account in the First State Bank of Spearman. The deposit slip shows a deduction for a note of $126.25 and an interest rebate, leaving a net deposit of $328.82. The deposit was the proceeds of sale of six heifer calves which had been purchased and sold for Robert, Jr. by the petitioner, and had been branded "A-Bar." They were sold along with other cattle. Robert, Jr.'s account showed $328.82 until December 15, 1941. On December 10, 1941, the petitioner wrote a check "Robert Alexander, Jr., by Robert Alexander, Sr. *275 " upon the First State Bank of Spearman in the amount of $530.44 to The Guymon Sales Co. for eleven cattle. The check was deposited on December 13, 1941, in a bank at Amarillo, Texas, and was paid on December 15, 1941. On December 15, 1941, there was deposited in the bank at Spearman $96 of $100 borrowed from that bank on that date by Robert, Jr., also $119.50 with the notation "Robert Alexander," making a total of $215.50. The $119.50 was the proceeds of the sale of a horse and cow which petitioner had given to his son. Robert, Jr. had borrowed the $100 on his promissory note which was not signed or endorsed by the petitioner. The eleven cattle were branded "A-Bar." They ran with the petitioner's cattle and Robert, Jr. rendered no more service to them than he did to the other cattle. On January 20, 1942, the petitioner wrote a check "Bobby Alexander by Robert Alexander" for $19 to "Guymon Sales." The check bears the notation "For 1 calf." He bought the calf for Robert, Jr., at his request. On June 13, 1942, Robert, Jr., on his own note, without the signature and endorsement of petitioner, borrowed from the bank at Spearman $104. In September 1942 Robert, Jr.'s account received $35 *276 from J. B. Cook for a horn; also $75 from petitioner. The horn had been sold for $75 and the petitioner had gotten the money and deposited it to the son's account. The $35 was a duplication. On September 2, 1942, there was deposited in Robert, Jr.'s account $1,956, being the proceeds of a $2,016 note less $60 interest. The note, which was due March 1, 1943, was executed to the bank by Robert, Jr. on September 2, 1942, but was guaranteed on the back by the petitioner. It bore notation "41 cattle." On September 3, 1942, Robert, Jr. executed to the petitioner a check for $1,956.49. The check bears the notation "For 30 steers." The petitioner had ordered some cattle from Oklahoma City to be delivered to Carrick, Texas, where the petitioner had farming and ranching interests. Petitioner paid a draft of $1,956.49 for the cattle. The cattle were brought to petitioner's ranch near Gruver, Texas, by mistake, but the petitioner told the driver to unload them and Robert, Jr. asked his father to let him have the cattle. Petitioner assented. They were branded with the brand of Robert, Jr. On December 31, 1942, Robert, Jr. executed his note, guaranteed on the back by the petitioner, to the bank *277 at Spearman for $4,455 due July 1, 1943. It bore the notation "94 cattle." On the same day he executed his check to the petitioner for $2,325.31, the check bearing the notation "For 52 str. calves." On the same day there was deposited in Robert, Jr.'s account in the bank $2,325.31, being the proceeds of the note of $4,455 "less note" $2,016; less also interest, with the addition of rebate. The petitioner and one Higgs had bought about 100 cattle together. They were shipped to Gruver, Texas. Petitioner took all the cattle and paid for them by check for $4,218.68, dated December 13, 1942. Robert, Jr. was away in school at the time. The cattle were branded with the brand of Robert, Jr., who said he wanted them. The books kept for Robert, Jr. do not show any deposits of money from cattle sales for 1942. Robert, Jr.'s bank statement for the period from September 18, 1941, to December 31, 1942, starts with a balance of $328.82 and ends with a balance of $21.39. There was an overdraft on December 31, 1942, of $2,303.92 but on that date $2,325.31 was deposited making a balance of $21.39. His statement from that date and amount to October 16, 1943, ended with a balance of $94.97. By December 18, 1943, his *278 balance was $760.79. Petitioner had been renting 160 acres of land from one Mollie E. Nelson for about 15 years. For 1942 he let Robert, Jr. have that land and it was planted in wheat. The petitioner furnished the necessary equipment and seed to put in the wheat crop. All the cattle of the petitioner and Robert, Jr. were pastured on the 160 acres of wheat. The petitioner paid the harvesting bills, and on September 1, 1943, Robert, Jr. gave to the petitioner his check in the sum of $238.16 bearing the notation "For cutting wheat $166, hauling wheat $72.16." On July 1, 1943, Robert, Jr. executed to the bank at Spearman his promissory note for $4,590, bearing the notation "100 cattle." The note is endorsed by the petitioner. It was secured by chattel mortgage executed by Robert, Jr. on 100 cattle, 41 of which were branded "A-Bar" and 50 branded "D". Eleven of the 41 were cows, with 9 calves. The other 30 were yearling steers. The chattel mortgage was executed by Robert, Jr. On August 7, 1943, petitioner deposited in Robert, Jr.'s account $3,863.76. On August 7, 1943, Robert, Jr. executed to the bank his check for $3,800 and the $4,590 note was credited therewith. The petitioner at *279 that time sold a considerable amount of cattle and those of Robert, Jr. were sold with his. Petitioner thought that was the time to sell the cattle. Robert, Jr. was glad to get the price which was paid. On September 2, 1943, petitioner deposited in the account of Robert, Jr. $846.45. On September 1, 1943, Robert, Jr. gave petitioner his check for $225, bearing the notation "For 3 strs." On October 15, 1943, petitioner deposited in Robert, Jr's account $427.80. It represented the proceeds of three steers sold from the petitioner's cattle. Robert, Jr. was not at home at the time. Petitioner sold some cattle and they were in that "bunch." On October 15, 1943, petitioner executed a check to the First State Bank of Spearman "Robert Alexander, Jr. by Robert Alexander, Sr." for $704.67. The check bears the notation "Note." The petitioner did not, before Robert went away to school, confer with him concerning paying off the note or selling the steers. On December 4, 1943, there was deposited in Robert, Jr.'s account at the bank at Spearman a total of $1,153.97, the deposit slip bearing in part the notation "Robt. Alexander $1,102.38." The $1,102.38 represented eleven steers in the name of *280 Robert, Jr. and sold with cattle of the petitioner. Throughout the year 1944 Robert, Jr.'s business was handled much the same as in 1943. The petitioner signed with Robert, Jr. (signing below Robert, Jr.'s name) a note for $3,194.25 dated April 24, 1944, the note being to the First State Bank of Spearman, Texas. It bears the notation "103 cattle." On August 30, 1944, Robert, Jr. executed his check to Robert Alexander for $2,308.02, the check bearing the notation "For cattle bought 28 head." On August 30, 1944, the petitioner signed with Robert, Jr. a note to the First State Bank of Spearman, Texas, for $3,265.25. The note bears the notation "131 cattle." He also signed with Robert, Jr. the chattel mortgage of the same date securing the note and describing 131 head of cattle as branded lazy "A" or "A-Bar" and "located on the Robert Alexander ranch." Ten Hereford cows were included. Both brands were those of Robert, Jr. He changed his brand. On the note and mortgage the petitioner signed below Robert, Jr.'s signature. On December 20, 1944, Robert, Jr. executed his check to The Guymon Sales Co. in the amount of $2,959.53, the check bearing the notation "For 58 cattle." The petitioner *281 had bid the cattle in, with Robert, Jr. present. Robert, Jr. paid estimated amounts for feed and cake expenses incurred during 1944. Robert, Jr. for 1944 had the 160 acres which he farmed during 1942 and 1943. The petitioner had, about September 24, 1943, deeded to Robert, Jr. 653 acres of grazing land, which he valued for gift tax purposes at $10 per acre. The land was in the petitioner's pasture. Thereafter petitioner's cattle and Robert, Jr.'s cattle both pastured on the land. The petitioner's hired hands were paid salaries, but some of them were allowed also to have cattle of their own and to let them pasture without charge on the petitioner's land during the summer. They were charged feed during the wintertime. Some of the employees also had an interest in the wheat crops. When Robert, Jr. was away at school petitioner signed his name to checks for bills; when Robert, Jr. was at home he signed the checks. Petitioner never signed Robert, Jr.'s checks except on matters pertaining to Robert, Jr.'s business. Petitioner's reason for starting Robert, Jr. in the cattle business and keeping him there during 1942, 1943, and 1944 was in order that the boy would know how to do business, *282 as a matter of education as much as anything else. His intent was to teach the boy the cattle business, and he considered the best way to learn was by being in the business. That was the way the petitioner learned. During the taxable years the petitioner made all the purchases and sales of cattle, including those of the cattle contended to belong to Robert, Jr. He also purchased all the feed. When the proceeds of sales were received petitioner made the division at the bank between himself and Robert, Jr. and deposited the share of Robert, Jr. for him. The checks for the sales price were made to the petitioner. From 1942 through 1944 it was difficult for petitioner to secure labor. Robert, Jr., while at home, made another "hand." One man working for the petitioner had a boy three or four years younger than Robert, Jr. That boy did some work, driving tractors, for the petitioner. Petitioner, during 1943 and 1944, paid employees about $150 a month, together with some crop interest in the wheat, and about $5 a day during harvest. He paid the boy, who was younger than Robert, Jr., the same wages as a man while he was driving a tractor or plowing or drilling wheat. Robert, Jr. did not *283 do much driving a tractor. He generally looked after the cattle. Some books were set up for Robert, Jr.'s affairs, with the assistance of Nella Beth Alexander, in the latter part of 1942 or the early part of 1943. It is not unusual for banks in the vicinity of Gruver, Texas, to loan money to minors without security or endorsement, except on large amounts where endorsement of an adult is required. The First State Bank of Spearman, Texas, considered the loans to Robert, Jr. as good and expected to collect the money. Robert, Sr. had no written authority on the records of that bank to write checks on Robert, Jr.'s account. On large amounts the bank relied mostly on the father's endorsement. There was no understanding that the father would stand behind the two $100 notes which were not endorsed by him. The petitioner lived in Hansford County, Texas. The records of the Hansford County Agricultural Conservation Association contained performance reports and application of Robert, Jr. For the years 1943 and 1944 they show him farming 151.9 acres of land belonging to Mollie E. Nelson and paying one-fourth rent. The petitioner signed the performance reports and applications. On the application *284 he signed as agent for Robert, Jr. The tax records of Hansford County show inventories of property for 1943 and 1944 in the name of John Robert Alexander, Jr. For 1943 this shows 40 yearlings and 50 calves valued at a total of $880; also 640 acres of land valued at $2,560. For 1944 such record shows 10 cows and 40 yearlings of a total value of $630, and 640 acres of land valued at $2,560. The inventories placed in evidence bear no dates except designations of the respective years. For the year 1943 Robert Alexander, Jr. reported income of $2,881.08, being $846.45 from the sale of produce and $2,977.54 from the sale of cattle, a total of $3,823.99, less $942.91 expenses. The cattle are shown as sold for $5,445.53 with a cost basis or other basis of $2,467.99. The $942.91 expense is shown as $437.50 for pasture and feed and $238.16 for combining and trucking. For 1944 Robert Alexander, Jr. reported net income of $5,934.54 from farming and ranching, being $3,343.98 from grain, $104.75 agricultural program payments, $140 oil and gas lease rental, and $3,812.35 from sale of 106 steers with sales price of $10,657.77 and cost of $6,845.42; thus arriving at gross profits of $7,401.08 with *285 expense of $1,461.54, arriving at the net of $5,939.54. Apparently there is a $5 error in the $5,934.54 stated on the return. The $1,461.54 expense is $542.45 for feed, $733.40 for machine hire, $74.44 for state and county taxes, and $111.25 interest. Robert, Jr. filed no return for 1942 or earlier years. The petitioner reported net income as follows: For 1941 $7,610.35, for 1942 $20,074.54, for 1943 each petitioner reported net income of $18,542.05, a total of $37,084.10, of which $32,284.54 was net farm profit largely from sale of cattle and grain, and for 1944 each reported net income of $17,285.94, a total of $34,571.87, of which $22,617.59 was from farming and ranching, $526.18 in dividends or interest, $2,659.39 from oil and gas bonus or rentals, $797.92 from sale of capital assets, and $7,970.83 from partnership. The Commissioner for 1943, in addition to other adjustments, increased the petitioners' income by including the income reported by Robert, Jr., but allowed petitioners a dependency exemption for him. For 1944, in addition to other adjustments, the Commissioner increased petitioners' income by including therein $4,308.24 of the $5,939.54 of the income reported by *286 the son. Robert Alexander, Jr. was determined to have the following income: Crop rental (one-fourth of grain sales)
$ 835.99
AAA and oil and gas lease rental, as
reported
244.75
Compensation for services to father
625.00
$1,705.74
Less taxes paid on land
74.44
$1,631.30
Robert Alexander, Jr. was not emancipated prior to or during the taxable years. Opinion We have here the question as to whether certain income should be taxed to the petitioners, or, as they contend, to their son Robert, Jr. Partnership is not involved. Our only question is: Who earned the income; for income must be taxed to him who earns it. Lucas v. Earl, 281 U.S. 111; National Carbide Corp. v. Commissioner, 336 U.S. 422. The situation here is, in effect, that the son up until the time he was about 12 years old had approximately $90, a few dollars resulting from gifts and the remainder from proceeds of a gift which had been given to the boy by his parents. During that year, 1941, the father, one of the petitioners, sold six calves which he had purchased for the boy and deposited the proceeds, about $450, in an account in the boy's name. Later in the year *287 there was placed in the deposit about $200, being roughly $100 proceeds of sale of a horse and cow given to the boy by his parents and $100 borrowed by the boy on his own note. Some days prior to this deposit, and while the boy's account showed about $328, the father wrote a check on the boy's account for about $530 for eleven cattle. They were branded, as the six heifers had been, with a separate brand for the boy. The next year when the boy was about 13 years old the father endorsed the boy's note to the bank for about $2,000, and the boy took over 30 steers which his father had purchased; also in the same year on another note of $4,455 guaranteed by the father the boy borrowed money and took over 52 calves which the father had purchased. In the same year the father furnished the seed and equipment necessary to put in a wheat crop on a certain 160 acres of land which he had been renting for many years, but let the boy have. No returns were filed by or for the boy until the next year, 1943, the first taxable year here involved, in which he was 14 years old. In that year the father endorsed the boy's note for $4,590 and cattle were purchased with the proceeds. In 1944, when the boy *288 was 15 years old, the father signed with him a note for $3,265.25, for the purchase of cattle, described in a chattel mortgage securing the note. In that year he also signed with the boy a note for $3,194.25 which bore the notation "103 cattle." Other transactions throughout the years were in comparatively small amounts. All of the purchases and sales of cattle were made by the father. In 1944, the father deeded the boy 643 acres of grazing land. It was used for pasture both by cattle in the name of the son and by those belonging to the father. Altogether from 350 to 800 cattle were maintained upon the petitioner's ranch. The son did on the ranch what a boy usually does. He attended school at first near the ranch but from 1942 to 1948, therefore including the taxable years here involved, was in school at Canyon City, Colorado, about 300 miles away from home. He was at home only during the summertime and other vacations. The income here involved was produced from grain and from cattle, being about $850 for grain and about $3,800 for cattle in 1943, and for 1944 being about $3,300 for grain and about $3,800 for cattle. The figures just used are roughly those reported by the son, *289 less expenses. In short, the income here involved is from the business of raising cattle and grain. We have carefully considered the problem here involved, and we have come to the conclusion that the son did not earn the income, as contended by the petitioners, in any amount greater than the $1,631.30 ascribed to him by the respondent for 1944. It is true that beginning with some small gifts the son had contributed to some extent when he was 12 or 13 years old to the purchase of some cattle for him by his father. It is also true that later, when he was 14 and 15 years old, he had in his own name certain cattle transactions in rather large amounts, but with the exception of two loans of about $100 each in the earlier years his father always guaranteed, signed, or endorsed the boy's notes. No important purchase was made except from proceeds of such notes. Without his father's credit it is obvious that the cattle would not have been bought, the income not earned. An officer of the bank which lent the money when asked to explain why the petitioner had to endorse the son's notes in the larger amounts stated: "Why, Bobby is a minor and on large amounts we require that as a rule." He further *290 stated that on the larger amounts the bank relied mostly on the father's endorsement. Thus, it is apparent that the financing, obviously a very important part of the cattle business, was furnished by the father. The cattle purchased with these borrowings were run on the family ranch, along with those of the petitioners. The son was away at school throughout the years here involved except during vacations. It nowhere appears that he contributed anything more to the earning of the moneys here involved than the ordinary services of a ranch boy on the ranch, and that, of course, was limited to a comparatively small portion of the year. The father purchased and sold the cattle. He made deposits in the son's bank account. He signed the son's papers before the Agricultural Conservation Commission. He wrote many of the checks on the boy's account, though many were also written by the boy himself. On occasion at least he bought and sold without the boy's knowledge. Once he paid off the boy's note without consulting him. The record before us does not demonstrate that the boy of 14 or 15 years had the knowledge or ability to earn the money involved in this matter. It is clear that his father's *291 experience, ability, and handling of the cattle and farm, including the furnishing of pasturage, feed, seed, and equipment (though the cost of feed and seed thereof was later apportioned as between the son and the petitioners), was responsible for the earnings which we here have for consideration. To hold that the moneys here involved were the income of the son merely because he had cattle in his name which were sold, and received money from wheat raised, would be to assume that nothing but ownership of cattle is necessary in order to derive income from the cattle business, and that nothing but ownership of an agricultural lease is necessary in order to have income from wheat produced on such lease. We can not so assume, for it is obvious that successful cattle raising entails judgment in buying, caring for, feeding, pasturing and disposing of cattle, including ability to know when and what to buy and when to sell. The father here is shown deciding when to sell, without conferring with the boy. The same ability, experience, and judgment is clearly essential to successful wheat farming. Not only does the record here fail to indicate such judgment and ability in the petitioner's son, *292 but it is negatived by his age of 14-15 years and the fact that the buying and selling was done by his father. As to the income from wheat, the father furnished the necessary seed and farm implements, and the record fails to show that the son did any work at all in that connection. On the contrary, it appears that what he did was the "mostly riding work," though "at odd times when we would be short he would help with the farming work." The son himself testified that he helped with the cattle, helped with whatever there was to be done, fence building and fixing windmills. He drove a tractor "just in an emergency." Thus, it appears that he did no farm work (as distinguished from working with cattle) of consequence, and none of that is shown done on the 160 acres of wheat. As to the cattle also, though the son, from September 1943, owned 653 acres of grazing land, and contributed it to the common use of the family herds, his father had ten or eleven sections of grass land, on which there were 350 to 800 cattle, and all of the cattle were handled together, so the father appears to have furnished much the larger portion of the grazing and pasture for the cattle bearing the son's brand, *293 without payment from the son. In addition, it seems clear that the father furnished the care, management, and control of the cattle, including some cows and calves, as well as the judgment involved therein, for the son was not present more than a small part of the time - 3 or 4 months a year. We can not regard the boy's work on the ranch as consideration, for the pasture, management, custody, and control exercised by the father over the son's cattle, for the father, as such, had a right to such services. It is suggested that the son had been emancipated. Emancipation involves an intent by the parent to release all legal rights and divest himself of all legal duties of the relationship. Taubert v. Taubert, 114 N.W. 763, 46 C.J. 1342. The burden is on one contending for emancipation so to show. In our view, it has not here been demonstrated. The parents did not leave the boy to shift for himself. Instead, they paid his living expenses and continued to send him away to school at their expense and obviously did not release him or themselves from the usual relation of parent and child, which by adoption they had assumed. They assisted in the usual parental manner. The mere *294 attempt to educate him in the cattle and ranching business, through some experience in it, by no means convinces that he had been emancipated. Jacob DeKorse, 5 T.C. 94; aff'd., 158 Fed. (2d) 801. A realistic approach to this question precludes payment to the father, for the pasture, seed, etc., furnished by him, by the boy's doing "what a boy of his age would do" on the ranch. Since Corliss v. Bowers, 281 U.S. 376, much has been said about taxation of income to one whose command over it is unfettered. The petitioner had command of the ranch and its operations and conducted such operations, most of the time in the absence of the son. He could and did draw checks on his son's account. Whether he advised the son beforehand of all of the cattle purchases on his behalf appears questionable on the record. Though the principle of the Corliss case is perhaps not applicable here in its fullest extent, it is not amiss in this situation for it is clear that the father financed, assisted, and arranged the purchases and sales, as well as the farm operations, and equally clear that it was all done under his guidance and direction. Indeed, the petition on *295 brief states that the cattle purchases and sales were made under the guidance of petitioner. We see no fetters on the petitioner in the production or control of the income produced in this cattle and grain business. Even after earned and placed in the son's account, the father could check on it. Nor does the record before us indicate what portion of the earnings from purchase and sale of cattle should be ascribed to one who merely owns cattle without contributing to the purchase, management, and sale thereof; Louis Visintainer, 13 T.C. - No. 104 (November 28, 1949), where we held that income from a sheep ranching business, consisting primarily from the proceeds of wool and lambs, was taxable to the father though his minor children owned a portion of the sheep, because of gifts to them. One of the minors in that case, the boy, helped take care of sheep and did odd jobs during vacation, much as in this case. We would, under the evidence before us, be altogether unjustified in attempting, under Cohan v. Commissioner, 39 Fed. (2d) 540, to allocate a part of the income to the son. We have considered fully the element and idea that the father, as he said, for the education *296 of his son in the cattle business, had assisted him in the transactions described in the facts, and intended to teach him the cattle business, but our problem is as to "* * * who presently earns the income * * *." Commissioner v. Culbertson, 337 U.S. 733. In that case the court further said: "The vagaries of human experience preclude reliance upon even good faith intent as to future conduct as a basis for the present taxation of income." Commissioner v. Culbertson, supra. Upon all of the facts before us, and considering the dominant and indispensable part played by the father in these transactions, in furnishing capital and credit, caretaking during the boy's absence, furnishing pasturage, clearly an important if not major element in raising and marketing cattle, and in actually running the business on his own judgment, initiative and responsibility (as a minor the boy would have been responsible for no losses), we can not escape the conclusion that the father earned the income. The deposit thereof, after it had been earned, in a bank account for the son does not indicate otherwise. We hold the income involved to be taxable to petitioners. The son was by *297 the petitioner given 653 acres of land in September 1943. We recognize the ownership by the boy in the land, and insofar as the ownership thereof, in and of itself, created income we would not ascribe it to the parents, but the land was merely used to graze cattle, both those of the petitioners and those purchased for the boy, and nothing of record enables us in any way even to estimate the rental value of the land for the rest of 1943 and 1944. The Commissioner in determining the deficiency did not charge the petitioners with income from all of the proceeds of sales of grain from the 160 acres of rented land turned to the son by the petitioner, but allotted to the son one-fourth of the $3,343.98 reported by him. (This allowance appears to have been on the theory that, as the petitioner testified, it was the custom to permit employees, in addition to wages, to have some share in the wheat crop.) Since nothing in the record before us indicates that the son contributed in any essential way to the production of the income from the grain, for the father, who had been renting the land for a long time, simply let the son have the proceeds for that year (even furnishing the seed and equipment), *298 we can not say that the Commissioner erred. In our view, there is here assignment of income under Lucas v. Earl, supra.That conclusion likewise indicates, in our opinion, that there is no error on the part of the Commissioner as to 1943, as to which year he ascribed no part of the income to the son. For that year he allowed petitioners a deduction for dependency because of the minor. Though the petitioners urge that Section 25(b)(2)(A) of the Internal Revenue Code prevents consideration of the boy as a dependent for 1943, that section merely provides the credit for a person dependent upon and receiving his chief support from the taxpayer "if such dependent person is under 18 years of age * * *." Though the record here shows a rather large amount of money from cattle and grain ascribed to the son, he was under 18 years of age and the record does not indicate that he did not receive his chief support from his parents. They paid his living expenses and supported him at school, which was about nine months a year. The record does not show that he used his own money in any considerable amounts for his own support; and certainly fails to show that he was *299 his own chief support. The amendmnt of Section 25, to make gross income of $500 the test of dependency, was not in effect until 1944. We see no error in the allowance of the credit for dependency. Because of issues stipulated Decision will be entered under Rule 50.